J-S19031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: J.V. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 215 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  No. 255 OC 2020

| | | |
|---|---|---|
| IN RE: B.V. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 216 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  256 OC 2020

| | | |
|---|---|---|
| IN RE: J.V. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.V., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 217 WDA 2021 |

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  254 OC 2020

| | | |
|---|---|---|
| IN RE: B.V. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

J-S19031-21

APPEAL OF: J.V., FATHER

:
:
:
:
:
:
:
:
:
:                  No. 218 WDA 2021

Appeal from the Order Entered January 26, 2021
In the Court of Common Pleas of Clarion County Orphans' Court at
No(s):  253 OC 2020

BEFORE:  DUBOW, J., MURRAY, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:                    **FILED:  July 1, 2021**

J.V. (Father) appeals from the January 26, 2021 orders of the Court of Common Pleas of Clarion County (trial court) terminating his parental rights to Be.V. (age 10), Ju.V. (age 6), Jo.V. (age 4) and Bn.V. (age 3) (collectively, Children).[1]  We affirm.

**I.**

We glean the facts of this matter from the transcript of the goal change hearing held on October 20, 2020, and the transcript of the termination hearing held on January 19, 2021.  Following multiple dependency cases in

---

* Retired Senior Judge assigned to the Superior Court.

[1] Father filed a separate notice of appeal at each docket number in the trial court and we consolidated his appeals *sua sponte*.  **See** Pa.R.A.P. 513.  The trial court also terminated the parental rights of J.M.-B. (Mother) at the conclusion of the hearing.  We address Mother's appeal separately at docket numbers 252-255 WDA 2021.

Armstrong and Clarion counties from 2009 onward, Clarion County Children and Youth Services (CYS)[2] took emergency physical custody of Children in July 2019. They have remained in foster care ever since.

**A.**

The first witness at the goal change hearing was Jackie Peters (Peters), a supervisor at the Armstrong County Children, Youth and Family Services (Armstrong CYF). Peters testified that Armstrong CYF had been consistently involved with the family from 2009 until 2019 and had received 28 referrals related to the family over that time. Armstrong CYF filed for dependency for Children in 2009, 2015, 2017 and 2018. Peters testified that the family had issues with housing, domestic violence between Mother and Father, instability in their relationship and Mother's mental health. Armstrong CYF had offered in-home services for the family from multiple providers as well as counseling services for two of the Children, mental health services for Mother and anger management services for Father. In 2018, they increased the in-home services from 18 hours per week to 23 hours per week. Families usually receive no more than 10 hours of services per week.

Peters testified that in January 2017, Father slapped Be.V. and threatened her with a belt, prompting Mother to obtain a temporary PFA

---

[2] CYS, legal counsel for Children and Children's guardian *ad litem* (collectively, Appellees) filed a joint brief in these appeals.

against him. Mother reported Father for domestic violence and obtained temporary PFAs against him on multiple occasions. At one point that year, Father and Mother voluntarily placed Children with a family in Clarion County. They left Children with limited clothing and supplies and Be.V. and Jo.V. needed immediate medical treatment. At that time, Armstrong CYF received a referral because Father and Mother had not been administering Ju.V.'s seizure medication. Armstrong CYF also learned that cable bills had been opened in Be.V. and Ju.V.'s names.

Father completed an anger management program from February to August 2017. The 2017 dependency case was closed in December but Father and Mother agreed to continue working with services. However, Armstrong CYF received two new referrals related to the family within 20 days of closing the case. Peters testified that Father was an indicated perpetrator of physical abuse as a result of one of the referrals because he struck Jo.V., who was one year old, multiple times causing a nosebleed. They were also discharged from in-home services for noncompliance.

Armstrong CYF resumed in-home services with the family, which included more anger management treatment for Father. Children were adjudicated dependent again in March 2018. The family's housing remained unstable and had problems with bedbugs and lice. The in-home services team determined that Father and Mother both needed substantial assistance with parenting skills and supervising Children. Peters testified that Be.V.

performed a lot of the parenting tasks for her younger siblings. Father still exhibited aggression and anger when engaging with services and with Mother, including making threats about having a gun in the home. Despite working with services, Peters said that in mid-2018, the home was full of garbage, dirty dishes, diapers and flies.

In early 2019, Father and Mother had not improved their living conditions and were evicted from their home. They moved in with one of Father's family members in Clarion County. Peters testified that the family had not resolved any of the issues related to housing, instability, anger management and mental health while their case was open in Armstrong County. The case was transferred to CYS after the move.

Judy Myers (Myers), an ongoing supervisor at CYS, testified that in 2015, there were allegations that a babysitter had sexually abused Be.V. and Ju.V. Mother said that she had difficulty believing Be.V.'s allegations because she had never experienced abuse herself from that individual. When a no-contact order was entered for Children, Mother asked if she and Father could continue to have contact with the babysitter without Children present. The babysitter was eventually convicted for crimes related to sexual abuse of Be.V., sentenced to prison and indicated as a perpetrator of sexual abuse.

Myers testified that Mother moved back and forth between Armstrong and Clarion counties several times over the years, making it difficult to establish services in either county. CYS accepted transfer of the instant

dependency case from Armstrong County in March 2019. Children had been adjudicated dependent for approximately one year. When they moved to Clarion County, the family lived with one of Father's relatives in a three-bedroom home with 12 or 13 residents. They shared four twin beds between Mother, Father, Children and three additional children. The house was in poor repair and infested with bedbugs. Children would also sleep in a van outside.

CYS took emergency custody of Children in July 2019 after Mother took them to Elk County and left them with strangers she had met a few days prior. When Myers retrieved Children, she found that they were dirty and did not have shoes. Ju.V. did not have his medication. On the drive back to Clarion, Be.V. told Myers that she was afraid to go home because Father hits everyone. She said that Mother was always leaving and she was not sure who her real father was. She did not want to return to Father. Mother was charged with child endangerment based on this incident.

Amanda Gregory (Gregory), an ongoing caseworker at CYS, testified regarding Father and Mother's family service plan goals for reunification with Children. The first goal for both parents was to maintain a safe living environment. Gregory testified that Father obtained an apartment in January 2020 but CYS did not consider it a stable living environment because he had faced eviction three times. Father was also behind on his gas bill and kept a gun in an unlocked closet in the bedroom. He did not lock the closet even after CYS told him to make sure it was locked before visits with Children.

Father was employed at a cleaning company and his hours fluctuated depending on the time of year. He earned $1,100 to $1,200 per month in the summer and approximately $640 per month in March and April. He earned approximately $17,000 in 2019. CYS instructed Father to work with a services provider to develop a budget but he did not follow through with that service.

Father also had a goal to develop anger management skills and he participated in four anger management programs while the family was involved with Armstrong CYF and CYS. He completed two of the programs successfully, was unsuccessfully discharged from one and discontinued one when he moved from Armstrong to Clarion county. Gregory testified that she was still concerned about Father's anger management skills. An in-home services team had reported that Father frequently yelled at their staff, Mother and Children during his visits and became angry or impatient with Children. He had been indicated as a perpetrator of physical abuse against Jo.V. after he completed his first anger management program.

Father and Mother both had a goal of developing their parenting skills. Father was still enrolled in his program at the time of the hearing and had completed four classes. Gregory testified that neither of them demonstrated appropriate parenting skills during visits with Children. Before the hearing, CYS held supervised visits at Father's home to determine whether their parenting skills would improve in the home. Gregory said that Father's parenting did not improve even with coaching assistance during visits. He

would concentrate on cooking and cleaning but not on interacting with Children. Father and Mother would both question Be.V. during visits about why she did not want to talk to them or why she did not love them anymore, which made her uncomfortable. She would be unable to sleep the nights before and after her visits and would get stomach aches and panic attacks.

Be.V. refused to attend visits for approximately three months. When she refused visits, there were incidents when Father and Mother would follow Be.V. around the public pool while she was there with her foster family. On one occasion, Mother followed Be.V. into the changing room and pulled the curtain back, exposing her to the room. Be.V. started having anxiety and panic attacks when visiting the pool. Be.V. consistently told the caseworkers that she did not want to attend visits with her parents.

Gregory testified that Father and Mother separated and reconciled several times over the course of the case and both were currently married to other people. At the time of the goal change hearing, Father and Mother had resumed their relationship for approximately three months. At the prior review hearing in June 2020, they were ordered to attend either couples counseling or co-parenting counseling. They had a single couples' counseling session in October 2020.

Gregory said Be.V. wanted to be adopted by her current foster family. She was excelling academically in her foster home, had perfect attendance at

school and attended therapy weekly.[3]  Ju.V. had some behavioral issues while the case was pending, including stealing money and destroying his shoes and toys.  On one occasion, he carried a sharp metal nail file in his pocket and said that he needed it to protect himself in case Father and Mother tried to kidnap him.   He had nightmares about kidnapping and was attending therapy biweekly but was doing well in school.  Jo.V. was in the Head Start program and was doing well with her foster family, but she would have attitude problems after visits with Father and Mother.

Bn.V. was also doing well in her foster home but would exhibit behaviors like fighting and biting after returning from visits with Father and Mother. Bn.V. had stopped biting others after adjusting to her foster home but the behavior resumed when she began visiting with Father and Mother.  She was receiving speech therapy.  Gregory testified that when Bn.V. was placed at 15 months old, she did not talk at all.  At the time of the goal change hearing, she would only speak one word at a time.

---

[3] Be.V.'s therapist testified at the hearing and said that Be.V. had anxiety surrounding visits with Father and Mother and was distressed regarding the incidents at the pool.  Mother participated in one therapy session with Be.V. but did not obtain a release from her own therapist to collaborate for further joint sessions with Be.V.  Be.V. did not want to attend therapy with Mother and told her therapist that she did not believe her parents could change.  She said she wanted to be adopted by her foster family so that she could have a stable home environment.

Gregory testified that all of the Children were thriving in foster care with families who were willing to adopt them. Their foster families encouraged them to visit with each other. They had been in foster placement for 15 months at the time of the hearing. Gregory said that Father and Mother had minimally met the goals for reunification by completing anger management and parenting programs but were still unable to apply what they had learned in visits with Children. She did not believe they had benefited from counseling and mental health services.

Amber Everett (Everett) of JusticeWorks Youth Care testified regarding her work as Father and Mother's visiting coach and as Father's parent educator. From February through August 2020, she met with Father and Mother before and after supervised visits to discuss Children's needs and review the visit. She testified that Father still needed a lot of coaching and assistance, and he struggled to engage with Children and plan ways to address their needs. He did not retain coaching information between visits and needed the same redirection at each visit. Father did bring food for the visits and craft projects for Children to work on. Father continually blamed Mother for Children's removal from the home. He would yell at Everett during their sessions and was unable to manage his anger. Father and Mother would not ensure Children took bathroom breaks during the visits and would become frustrated with Bn.V. when she soiled herself as a result. Everett testified that Father and Mother both needed her assistance during the majority of the

supervised visits and neither of them would use the parenting skills they had been taught without coaching.

Hannah Seigworth (Seigworth), a case aide at JusticeWorks Youth Care, supervised the visits that took place at Father's home beginning in September 2020. She testified that she had to remind Father to lock the closet where he kept his gun multiple times. On one occasion, Father attempted to discipline Ju.V. by picking him up by his armpits, causing Ju.V. to run away and look afraid. Father and Mother would argue and yell at most visits and did not supervise Children closely. Children would run into other rooms or outside of the yard and Seigworth would have to direct Father and Mother to locate them. Based on her observations at the home visits, she believed it would be a safety risk for Father and Mother to have unsupervised visitation with Children. She did not see any progress in their parenting skills over the nine supervised visits she conducted at the home.

Be.V. testified that she was happy in her foster home and wanted to remain there. She said that she does not like visiting with Father and Mother and that Father yells at her during the visits. She said that Children did not get enough attention when they lived with Father and Mother and that she had to act like a mother to her younger siblings. She said that when they lived with Father's relative, Father and Mother would leave for weeks at a time and they would not know when they would be coming back. She believed that if Children were returned to Father and Mother that they would be returned to

foster care within five months. She said that Father and Mother had not changed and that she wanted to stop visiting with them and be adopted.

At the conclusion of the hearing, the trial court changed the permanency goal for Children from reunification to adoption and ordered that they have no further visitation with Father and Mother. CYS subsequently filed petitions to terminate Father's parental rights.

**B.**

Gregory testified again at the termination hearing held on January 19, 2021. Children had been in placement for 18 months. She testified that since visitation with Father and Mother had ceased, Be.V. no longer had stomach aches, panic attacks or trouble sleeping. She had been less depressed and anxious and decreased her therapy sessions from weekly to monthly. Ju.V. was no longer afraid of being kidnapped by Father and Mother. He had moved to a new foster home and adjusted well without behavioral problems. He attended weekly therapy. Jo.V. had no behavioral issues in her foster home. She referred to her foster parents as mom and dad and her foster siblings as her brother and sisters. Bn.V. had only two instances of biting since visitation ceased when she would normally bite for a couple of days after each visit. She had continued with weekly speech therapy. Children's foster parents were all able to adopt Children and they had weekly visits with each other.

Gregory testified that Father and Mother did not make any additional progress on their reunification goals after the goal change hearing. They

attended four additional couples' counseling sessions but were still fighting with each other. Father had kept his apartment clean since the hearing but had not worked with the budgeting counselor or verified whether he was current on his utility bills. He had earned approximately $15,600 in 2020.

Father and Mother had not had contact with Children since the hearing. Gregory reported incidents where they parked outside of Be.V.'s foster home and only left when CYS threatened to call the police. They also followed Be.V. on Halloween when she was trick-or-treating, which made her feel unsafe. Gregory concluded that Father and Mother had not made sufficient progress on any of their goals and recommended termination of their parental rights. She did not believe termination would have a negative effect on Children and said that it would be in their best interests to remain with their foster families.

Mother also testified at the termination hearing. She said that she attended counseling every week by video-chat and had remained current on her medication. She said that she had beds and clothes for Children at her home but CYS had not inspected her residence since the goal change hearing. She and Father were not in a romantic relationship but had continued couples' counseling. She testified that she left her job at Subway because she could only work 25 hours per week without losing her benefits. She said that Children always showed affection during past visits and were happy to see her, but that Be.V. had mixed emotions about visiting. She said that she parked outside of Be.V.'s foster home when she was visiting an office nearby

and only approached her on Halloween to say hello and take a picture. She did not want her parental rights to be terminated and believed that it would not be in Children's best interests.

Tina Morgan (Morgan), a parent educator from the Jefferson-Clarion Early Head Start program, testified that she had weekly visits with Father beginning in July 2019 to work on educational, nutritional, health and parenting skills. She said Father was open-minded and willing to learn and he never missed a visit or yelled at her. Once she started attending visits with Children at CYS and JusticeWorks, she said that Father would always cook for them, help with homework and spend quality time with them. She said he would get frustrated because he did not get enough quality time with Children. Morgan said that Mother attended approximately ten of the visits when she was working with Father but she did not work with Mother on a weekly basis. She did not believe that they co-parented well but said that with counseling, they may be able to learn. She worked with Father over the phone until November 2020 but she stopped attending visits in March 2020 due to the pandemic.

Father also testified that he had maintained his apartment for over a year, had three bedrooms and was current on rent and utilities. He said that his guns have trigger locks and he had two locks on the closet where they are stored. He had worked at his cleaning job for approximately seven years and earned $11 per hour. He said that he did not know that he could continue the

budget counseling voluntarily after the goal change hearing. He completed an anger management course in 2020 and continued to see his counselor every other week. He stopped participating in parenting classes with JusticeWorks after the goal change hearing but said that the visits with Children went well prior to the goal change. He said he was frustrated during the visits because they were too short to have a meal, complete homework and spend quality time with all of the Children. He attends couples' counseling every other week with Mother. He did not want his parental rights to be terminated and requested the Children be returned to his care.

Following reception of the evidence, the trial court granted the petitions to terminate Father's parental rights.[4] Father filed timely notices of appeal and he and the trial court have complied with Pa.R.A.P. 1925. On appeal, Father argues that the trial court abused its discretion in terminating his parental rights to Children pursuant to subsections 2511(a)(1), (2) and (5) of the Adoption Act and in failing to address Children's best interests under Section 2511(b) in the order terminating his parental rights or its subsequent opinion.

_____

[4] The trial court granted the petitions orally on the record at the conclusion of the hearing and the written orders were docketed on January 26, 2021.

- 15 -

**II.**

**A.**

"The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [the subsections of 23 Pa.C.S. § 2511(a)]." *In re Adoption of J.N.M.,* 177 A.3d 937, 942 (Pa. Super. 2018) (quoting *In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007)).  Clear and convincing evidence is that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re D.L.B.*, 166 A.3d 322, 326 (Pa. Super. 2017) (citation and quotation marks omitted).  The orphans' court may then enter a final decree of involuntary termination if it is in the child's best interests as outlined in Section 2511(b).  *Id.*[5]

The trial court found clear and convincing evidence to terminate Father's parental rights pursuant to subsections 2511(a)(1), (2) and (5).  When

---

[5] We review such a decree for an abuse of discretion.  *In re G.M.S.*, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted).  Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." *In re Interest of D.F.,* 165 A.3d 960, 966 (Pa. Super. 2017).  "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re A.S.*, 11 A.3d 473, 477 (Pa. Super. 2010).  "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *Id.*

- 16 -

reviewing a trial court's order terminating parental rights, we need only agree as to one subsection of Section 2511(a), as well as Section 2511(b), to affirm the order. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Accordingly, we proceed to our analysis of the trial court's findings under subsection 2511(a)(2):

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2). Under Section 2511(a)(2), parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002). The grounds for termination of parental rights under subsection 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; those grounds may include acts of refusal as well as incapacity to perform parental duties. *Id.* at 337.

Because subsection 2511(a)(2) focuses on the child's need for essential parental care, control or subsistence, a parent's sincere efforts to perform parental duties may be insufficient to remedy parental incapacity under this subsection. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). "[W]hen a

parent has demonstrated a continued inability to conduct his . . . life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." *Id.* at 1118 (citation omitted).

Father argues that he has never refused to provide essential parental care to Children and that he has complied with the goals set forth by CYS in his family services plan. He argues that he obtained stable housing, maintained employment, worked with all required services and attended all supervised visits while Children were in placement. However, the record reveals that Father's efforts at meeting his goals were minimal, and despite years of services provided by Armstrong and Clarion counties, he remains incapable of providing for Children's essential parental needs.

Armstrong CYF and CYS were involved with the family beginning in 2009 and Children were adjudicated dependent in 2009, 2015, 2017 and 2018. At the time of the termination hearing, Children had been in foster care for approximately 18 months. At one point the family was participating in in-home services for 23 hours per week, which was far above what an average family would receive during a dependency case. By the time of the goal change hearing, Father had only attended four parenting classes and had not successfully completed his program. More importantly, the service providers and caseworkers who supervised his visits with Children testified that despite

ongoing assistance and coaching, Father was unable to appropriately interact with Children and meet their needs during his limited supervised visits. He would concentrate on cooking and cleaning but not interacting with Children and he had to be coached on the same behaviors repeatedly. Seigworth believed that it would be a safety risk to allow Father to have unsupervised visitation with Children.

A primary goal for Father was to attend anger management classes and develop his anger management skills, as domestic abuse and fighting between Father and Mother was an ongoing issue throughout the dependency proceedings. Father attended four anger management programs and completed two of them successfully. Nevertheless, Father was indicated as a perpetrator of physical abuse for an incident in which he struck Jo.V. in the face after he had already successfully completed one anger management program. Everett and Seigworth testified that he continued to yell and act aggressively toward Children, Mother and service providers during the supervised visits. While Morgan testified that Father was cooperative and willing to learn during her parenting sessions, she did not observe the visits that took place from March 2020 onward. She also stated that Father and Mother could not co-parent successfully by the time of the termination hearing. Finally, Father and Mother began couples' counseling shortly before the goal change hearing, and despite the counseling, were still fighting by the time of the termination hearing.

Father did obtain an apartment in January 2020 and was able to maintain that residence until the termination hearing. However, he faced eviction three times and was delinquent on his gas bill at the time of the goal change hearing. He had earned approximately $15,600 in 2020. CYS arranged for Father to work with a counselor to develop a household budget but he did not provide the counselor with his paystubs and bills for help developing a budget.

Because subsection 2511(a)(2) focuses on the child's need for "essential parental care, control or subsistence necessary for his physical or mental well-being," even a parent's sincere efforts at providing parental care can be insufficient to remedy the parent's incapacity if those efforts are not likely to be successful in providing the child with essential parental care. *In re Z.P.*, *supra*. The record shows that Father made minimal progress at achieving the goals in his family service plan, particularly the goals of developing anger management and parenting skills that would allow him to safely care for Children unsupervised. The trial court did not abuse its discretion in finding that CYS provided clear and convincing evidence that Father either refused to or was incapable of providing Children with essential parental care. His first claim is meritless.

**B.**

Next, Father argues that the trial court abused its discretion by failing to consider whether termination was in Children's best interests under Section

2511(b). Appellees contend that Father waived this issue by failing to include it in his concise statement pursuant to Pa.R.A.P. 1925(b). *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived."); *In re G.D.*, 61 A.3d 1031, 1036 n.3 (Pa. Super. 2013). Our review of the record confirms that Father did not include this issue in his concise statement. Accordingly, it is waived.

Even if we were to reach the merits of this claim, we would conclude that the trial court did not abuse its discretion in holding that termination was in Children's best interests.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. . . . While a parent's emotional bond with his or her child is a major aspect of . . . [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015). "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *In re Z.P.*, *supra*. The court may also consider intangibles such as the love, comfort, security and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

While it did not specifically cite Section 2511(b) in the written order, the trial court stated on the record at the conclusion of the termination hearing that Children were "better off in their foster homes and their pre-adoptive homes." Notes of Testimony, 1/19/21, at 95. In its opinion, the trial court explained that there was no evidence in the record of a bond between Children and Father. Trial Court Opinion, 3/11/21, at unnumbered 7. The lack of bond was evident in Be.V.'s testimony when she explained that she did not feel that Father and Mother had changed at all over the course of dependency and said that she wanted to be adopted. She believed that if Children were returned to Father and Mother's care, they would reenter foster care within five months. The evidence at the termination hearing showed that Children were thriving in their foster homes and were no longer experiencing anxiety, depression, fear or behavioral problems after they ceased visitation with Father and Mother. The record amply supports the trial court's determination that termination of Father's parental rights would serve Children's best interests.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/1/2021